**Thomas ZARCONE, Plaintiff-Appellee,**

v.

**William M. PERRY,**
**Defendant-Appellant,**

**James Windsor, Robert J. Anderson and Patrick Giambalvo, Defendants.**

**No. 591, Docket 77–7469.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1978.

Decided March 3, 1978.

Arnold B. Firestone, Hauppage, N.Y. (Firestone & Chekenian, Hauppauge, N.Y., of counsel), for plaintiff-appellee.

Joseph D. Stim, Farmingdale, N.Y., for defendant-appellant.

Before FEINBERG and OAKES, Circuit Judges, and WYATT, District Judge.*

FEINBERG, Circuit Judge:

In this unusual civil rights case, William M. Perry, a former judge of the District Court of Suffolk County, appeals from a verdict in favor of plaintiff Thomas Zarcone, after a jury trial in the United States District Court for the Eastern District of New York, before Chief Judge Jacob Mishler. The basis of Zarcone's suit was that Perry and other defendants[1] had deprived plaintiff of his constitutional rights in violation of 42 U.S.C. § 1983. The jury awarded plaintiff $80,000 compensatory damages against Perry and Sheriff James Windsor, $60,000 punitive damages against Perry, and $1,000 punitive damages against Windsor. Only Perry appeals, and on the sole ground that the punitive damages award against him was excessive. We affirm.

## I

The incident that gave rise to the lawsuit occurred on April 30, 1975. On that night, then Judge Perry was in his chambers during a break in an evening session of traffic court in Suffolk County, Long Island. Zarcone was operating a mobile food vending truck outside the courthouse. Perry asked Deputy Sheriff Windsor to get some coffee, which he did. Both Perry and Windsor thought the coffee tasted "putrid," and Perry told Windsor to get the coffee vendor and bring him "in front of me in cuffs." Perry directed two plainclothes officers, who happened to be nearby, to accompany Windsor. Wearing his sheriff's uniform equipped with badge, gun and handcuffs, Windsor went to Zarcone and told him that the judge said the coffee was terrible and that Zarcone had to go inside to see the judge. Windsor handcuffed Zarcone, despite the vendor's protestations that it was not necessary. When Zarcone said he was too embarrassed to go into the courthouse that way, one of the officers suggested that Zarcone walk between them with Zarcone's jacket over his hands.

The group then marched through the hallway of the courthouse, in full view of dozens of people. Zarcone heard someone yell that they were locking up the frankfurter man. When they arrived at Perry's chambers, the judge asked if the Sheriff had "the coffee vending man there in handcuffs." Upon entering the chambers, Perry ordered Zarcone to be left "in handcuffs until I get finished with him." A pseudoofficial inquisition then began. Zarcone stood in front of the judge's desk, behind which the judge sat. A court reporter was present, along with Windsor and the two police officers. Perry told Zarcone that "I have the two cups of coffee here for evidence." According to Zarcone, whom the jury must have believed, Perry then started screaming at him, threatening him and his "livelihood" for about 20 minutes, and thoroughly scaring him. Just before Zarcone was allowed to leave, Perry commanded Windsor to note Zarcone's vehicle and vending license numbers and told Zarcone, "Mister, you are going to be sorrier before I get through with you."

---

\* Of the Southern District of New York, sitting by designation.

1. The suit also named Deputy County Sheriff James Windsor and two plainclothes policemen as defendants. The jury found in favor of the latter two defendants.

After Zarcone left, he resumed his mobile truck route and came back to the night traffic courthouse about 45 minutes later. Shortly thereafter, Windsor returned and told Zarcone they were to go back to the judge. Zarcone asked if he had to be handcuffed again, but Windsor said no. When they reappeared before Perry, he told Zarcone that he was going to have the two cups of coffee analyzed. Perry also said that if Zarcone would admit he did something wrong, then Perry would drop the charges. Zarcone consistently denied that anything was amiss with the coffee, and no charges were filed.

We have described the night's events in such detail to impart some of the flavor that must have so impressed the jury. The unfortunate occurrence was publicized at the time, and ultimately led to the removal of Judge Perry from the bench.[2] There were unpleasant consequences for Zarcone, as well: He testified that he was very upset by the incident, that he could not sleep, and that he started to stutter and get headaches. Zarcone also required treatment at the Coney Island Hospital, he could not work, and his wife asked him to move out of the house. We need not dwell on this any further, except to note that Perry does not complain here about the jury's award to Zarcone of $80,000 compensatory damages. However, Perry does challenge the amount of punitive damages, and we now turn to this issue.

## II

After the jury verdict, appellant unsuccessfully moved to set aside the award of punitive damages as excessive and for a new trial on that issue. Appellant impliedly concedes, as he must, that punitive damages may be an integral part of the remedy in a civil rights action. See, e. g., *Adickes v. S. H. Kress Co.*, 398 U.S. 144, 233–34, 90

S.Ct. 1598, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring in part and dissenting in part); *Sostre v. McGinnis*, 442 F.2d 178, 204–05 (2d Cir. 1971) (en banc), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d (1972); see also *Stengel v. Belcher*, 522 F.2d 438, 444 n.4 (6th Cir. 1975), cert. dismissed, 429 U.S. 811, 97 S.Ct. 49, 50 L.Ed. 2071 (1976). However, appellant argues that Judge Mishler erred in denying his motion for the following reasons: (1) The "historic range" of punitive damages awards in civil rights actions is only $500–$2,500; (2) the jury in a civil rights action already has wide latitude in awarding compensatory damages, and a substantial compensatory award (here $80,000) must already reflect "a punitive element"; (3) a substantial punitive damages award in a civil rights action "perverts the intent of the civil rights statute, which was to end racial discrimination"; (4) a substantial punitive damages award does not have any "rational deterrent effect" where the compensatory award was $80,000 and Perry was subject to disciplinary sanctions; and (5) since there was no proof in the record concerning Perry's net worth or income, there is no way of gauging the severity of his punishment. As will be seen below, we do not agree with these contentions.

It is apparent that many of appellant's arguments against the $60,000 punitive damages award are based on the uniqueness of a civil rights action. Since damage actions under 42 U.S.C. § 1983 are themselves of relatively recent origin, see *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), there is no long history of punitive damages awards under that statute. Therefore, in judging the excessiveness of the jury award here, we do not believe that we must limit our research to the developing case law under section 1983, as appellant contends. Such precedents are instructive, of course,[3] but the relative paucity of

---

2. The Appellate Division of the New York Supreme Court, Second Department, upheld findings that Perry had violated several canons of judicial ethics in running roughshod over Zarcone's constitutional rights and that Perry had testified falsely at his disciplinary proceeding.

*In re Perry*, 53 A.D.2d 882, 385 N.Y.S.2d 589 (2d Dept.), appeal dismissed, 40 N.Y.2d 1079, 392 N.Y.S.2d 1029, 360 N.E.2d 964 (1976).

3. Despite the limited number of reported cases awarding punitive damages under section 1983, several decisions have upheld substantial ver-

such cases suggests that we look elsewhere as well.

 This approach is supported strongly by the thrust of 42 U.S.C. § 1988, which directs the federal courts to invoke state law remedies as a supplement to federal substantive law when necessary to vindicate fully the civil rights of a meritorious complainant.[4] See, e. g., *Moor v. County of Alameda*, 411 U.S. 693, 698–703, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Moreover, there is no logical reason why general principles of damages should not apply to a civil rights action. The primary purpose of punitive damages is to deter similar occurrences in the future. See *Fisher v. Volz*, 496 F.2d 333, 347–48 (3d Cir. 1974); *Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 294 (5th Cir. 1970); see also Comment, Implying Punitive Damages in Employment Discrimination Cases, 9 Harv.C.R.–C.L.L.

Rev. 325, 334–37 (1974). It cannot be that it is less important to deter intentional deprivations of fundamental constitutional rights, such as the unlawful dragooning before a star chamber proceeding that occurred here, than it is to deter intentional injuries to personal property interests.[5] Therefore, we reject the notion that there is something inherent in civil rights cases, whether or not based on race discrimination, which precludes the award of substantial punitive damages in appropriate instances.[6]

A brief review of exemplary damages verdicts in the quite relevant, albeit more traditional, field of intentional torts demonstrates that the award here is not unprecedented. Over twenty years ago, this court upheld a $100,000 punitive award against an individual in a libel case where the actual damages were found to be one dollar. *Reynolds v. Pegler*, 223 F.2d 429 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100

---

dicts far in excess of the "historic range" of $500 to $2,500 asserted by appellant. See, e. g., *Palmer v. Hall*, 517 F.2d 705 (5th Cir. 1975) ($15,000); *Gaston v. Gibson*, 328 F.Supp. 3 (E.D.Tenn.1969) ($30,000); cf. *Claiborne v. Illinois Cent. R. R.*, 401 F.Supp. 1022 (E.D.La. 1975) ($50,000 in § 1981 action), appeal docketed, No. 75–3790 (5th Cir. Oct. 20, 1975). Moreover, some of the "historic" precedent is due to the $1,000 limit on punitive damages in fair housing civil rights suits, 42 U.S.C. § 3612(c). See, e. g., *Williamson v. Hampton Mgmt. Co.*, 339 F.Supp. 1146 (N.D.Ill.1972). Such congressional limitation is inapplicable to this appeal.

4. Section 1988 provides in relevant part:
 The jurisdiction in civil . . . matters conferred on the district courts by the provisions of this chapter . . . for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended

to and govern the said courts in the trial and disposition of the cause . . . . .

5. See, e. g., *Tri-Tron International v. Velto*, 525 F.2d 432, 437–38 (9th Cir. 1975) (total of $125,000 punitive and $60,000 compensatory damages awarded in trade secret action); *Burton v. Hitachi America, Ltd.*, 504 F.2d 721, 727 (7th Cir. 1974) ($50,000 punitive and $27,000 compensatory damages awarded in tortious interference with contract suit); *Sperry Rand Corp. v. A–T–O, Inc.*, 447 F.2d 1387, 1394–95 (4th Cir. 1971), cert. denied, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972) ($175,000 punitive damages awarded in trade secret suit).

6. As we have previously held, such awards need not be predicated on the award of substantial compensatory damages. See *Stolberg v. Members of the Board of Trustees*, 474 F.2d 485, 489 (2d Cir. 1973); *Goldwater v. Ginzburg*, 414 F.2d 324, 340 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). Similarly, there is no merit to appellant's converse claim that a large compensatory award in a civil rights action precludes a substantial punitive award. The purpose of the former is to make a plaintiff whole for his injuries; the main purpose of the latter is to deter defendant and others from similar conduct in the future. It is, therefore, clear that the jury's $80,000 verdict on compensatory damages here did not preclude the punitive damages award.

L.Ed. 754 (1955).[7] Similarly, in *Goldwater v. Ginzburg*, supra, we upheld a total of $75,000 in punitive damages against an individual and his corporation for their intentional wrongdoings. See also *Doralee Estates, Inc. v. Cities Service Oil Co.*, 569 F.2d 716 (2d Cir. 1977). Furthermore, a total of $100,000 in damages, the greater part of which was punitive, was upheld in the Seventh Circuit in an action for assault and false imprisonment. *Bucher v. Krause*, 200 F.2d 576, 586–88 (7th Cir. 1952), cert. denied, 345 U.S. 997, 73 S.Ct. 1141, 91 L.Ed. 1404 (1953). While those cases are factually distinguishable from this one, it is clear that substantial exemplary damages verdicts are appropriate in intentional tort actions not involving constitutional deprivations. A fortiori, it follows that the sizable punitive award assessed against Perry for his blatant disregard of appellee's constitutional rights cannot be criticized as unprecedented.

■ We also reject appellant's contentions that the award here was necessarily improper either because of Perry's removal from office,[8] or because of the lack of proof as to his net worth. As to the former, punitive damages are meant to deter others as well as the particular defendant. See Comment, Monetary Claims Under Section 1983; The Right To Trial By Jury, 8 Harv. C.R.–C.L.L.Rev. 613, 625–26 n.90 (1973); *Lee v. Southern Home Sites Corp.*, supra. Appellant's removal from office, which was apparently unknown to the jury, was thus unnecessary, if not irrelevant, to their determination. Nor do we agree that the absence of evidence regarding Perry's net worth or income required the judge to set aside the verdict. It is true that without such evidence no one can be sure of the severity of the monetary sanction that the jury imposed. A $60,000 award may bankrupt one person and be a minor annoyance to another. But the decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages. See *Tri-Tron International v. Velto*, supra, 525 F.2d at 438; *El Ranco, Inc. v. First National Bank of Nevada*, 406 F.2d 1205, 1218–19 (9th Cir. 1968), cert. denied, 396 U.S. 875, 90 S.Ct. 154, 24 L.Ed.2d 33 (1969); see also *Clark v. Bunker*, 453 F.2d 1006, 1012 n.11 (9th Cir. 1972); Note, Exemplary Damages in the Law of Torts, 70 Harv.L.Rev. 517, 528 (1957). Appellant chose not to offer such proof, despite his awareness of his potential liability.[9]

■ We are left, then, with the question whether under generally applicable standards, the punitive damages award here was excessive. As an initial matter, the standard used for appellate review of *compensatory* awards, where the trial judge has denied a motion to set aside the verdict as excessive, is whether the award is so high as to shock the judicial conscience and constitute a denial of justice. See *Grunenthal v. Long Island Railroad Co.*, 393 U.S. 156, 159, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968); *Batchowsky v. Penn Central Co.*, 525 F.2d 1121, 1124 (2d Cir. 1975); *Dagnello v. Long Island Railroad Co.*, 289 F.2d 797, 802 & 806 (2d Cir. 1961). Moreover, as Judge Friendly recently noted for this court, the same standard is apparently applicable to appellate evaluation of punitive damages awards:

> In three cases since *Dagnello* we have seemingly assumed, without discussion, that the standard of review with respect to punitive damages is the same. *Hope v. Hearst Consolidated Pubs. Inc.*, 294 F.2d 681, 691 (2d Cir. 1961), cert. denied, 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed.2d 388 (1962) (diversity libel action); *Diapulse Corp. of America v. Birtcher Corp.*, 362 F.2d 736, 744 (2d Cir. 1966), cert. dismissed, 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48 (1966) (diversity libel action);

7. Another $75,000 in exemplary damages was awarded against the corporate defendants, who had published the individual defendant's defamatory column. Id. at 431.

8. See note 2 supra.

9. Appellee's complaint sought $2,500,000 in damages.

*Lanfranconi v. Tidewater Oil Co.*, 376 F.2d 91, 94–98 (2d Cir.), cert. denied, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967) (diversity action for wrongful interference with business relationships). See also Restatement of Torts 2d, § 908(d) (Tent. Draft No. 19) (1973). *Morrissey v. National Maritime Union*, 544 F.2d 19, 34 (2d Cir. 1976).[10] See also *Doralee Estates, Inc. v. Cities Service Oil Co.*, supra, 569 F.2d at 722–723. We think that this standard is appropriately applied to the punitive verdict involved here. See *Guzman v. Western State Bank of Devils Lake*, 540 F.2d 948, 954 (8th Cir. 1976).

We turn to the ultimate question whether the punitive damages award of $60,000 is excessive. Given Perry's position, his relationship of power and authority to plaintiff, who was a simple coffee vendor, the handcuffing, threats and intimidation inflicted upon plaintiff, and Perry's outrageous conduct, we are not compelled to conclude that the jury acted out of "passion and prejudice." See *Reynolds v. Pegler*, 123 F.Supp. 36, 39 (S.D.N.Y.1954), aff'd, 223 F.2d 429, 434 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955). In short, we do not find that the verdict of $60,000 shocks our conscience. Perhaps to some the award might seem high and the incident exaggerated out of proportion. But the abuse of official power here was intolerable, and when a jury has dealt with it severely, as it should, we will not draw fine lines to restrain its dispensation of justice.

Judgment affirmed.

---

**10.** After thus summarizing the law, Judge Friendly stated "for himself alone . . . that the trend toward extremely large punitive damage awards may require trial and even appellate courts to subject such awards to more exacting scrutiny than award of compensatory damages." 544 F.2d at 34. But in view of the precedents, we do not understand Judge Friendly's view now to be the law, nor do we regard this egregious case as an appropriate occasion for reexamination of the standard of review.